UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | |
|---|---|
| PHILLIP TRAICOFF, d/b/a RENEGADE STUDIOS, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| DIGITAL MEDIA, INC., and STAFFING TOOLS, INC., | ) |
| | ) |
| Defendants and Counter-Claimants, | )    1:03-cv-1781-JDT-WTL |
| | ) |
| and | ) |
| | ) |
| DELBERT CRAIG HANE, GRAPHIC COMPUTER SOLUTIONS ONLINE UNIVERSITY, COLORBLIND, VANTAGE PARTNERS, LLC, IMAGING TECNOLOGIES, INC., and IMAGING TECHNOLOGIES CORP., | ) |
| | ) |
| Defendants. | ) |

**ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Docket Nos. 207, 208, 209) AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT (Docket No. 221)[1]**

Plaintiff, Phillip Traicoff d/b/a Renegade Studios, brings this suit against Digital

Media, Inc. ("Digital Media"), Staffing Tools, Inc. ("Staffing Tools"), and Delbert Craig

---

[1] This Entry is a matter of public record and will be made available on the court's web site.  However, this decision is based on the unique facts contained in the record, thus having no precedential value, and it is an unlikely candidate to serve as analogous authority. Additionally, the discussion contained herein is not sufficiently novel to justify commercial publication.  So, the court recommends against commercial publication of this entry, either in print or electronically, and would counsel against citation of it as authoritative outside of this unusual case.

Hane (collectively, the "Defendants") claiming breach of contract, copyright infringement, and fraud. In addition, Graphic Computer Solutions Online University, Colorblind, Vantage Partners, LLC, Imaging Technologies, Inc., and Imaging Technologies Corporation remain named defendants in this case. Currently before the court are the Defendants' motions for summary judgment (Docket Nos. 207, 208, 209) and the Plaintiff's cross-motion for summary judgment (Docket No. 221). After carefully reviewing the parties' briefs and supporting materials, the court finds as follows:

## I.      FACTUAL BACKGROUND

In the mid 1990s, three technologically savvy individuals, Michael Budd, Ian Creighton, and Dan Hoover, formed Digital Media. Digital Media developed computer software programs to train computer users on how to use various other kinds of computer programs. The computer software programs contained a voice component in which the program would actually speak to the user of the teaching/learning software as part of the training.

From 1996 to 2001, the Plaintiff worked for Digital Media as a shipping clerk and salesperson. The Plaintiff also owned a recording studio. In 1998, the Plaintiff began to work with Digital Media's developers in order to help produce the voice component for the software. Although he worked as an employee for Digital Media in other roles, the Plaintiff performed his recording studio work solely as a subcontractor, not an employee, and received separate pay for his recording work. Typically, the Plaintiff received a script from Digital Media, hired a narrator to read the script in his recording

studio, edited the script during the recording process,[2] created a digital recording of the script, and turned the recording over to Digital Media to use as the voice component in the software programs.

Amy Millar performed most of the audio narrations during the recording process. (Traicoff Dep. 28:19-24.)  However, two other individuals, an unidentified female and Ian Creighton, also performed a smaller portion of the earlier audio narrations.  (*Id.* 26:18-27:24.)  On June 10, 2001, Amy Millar signed an agreement granting the Plaintiff the exclusive rights to the use of her voice.  (Pl.'s Br. Supp. Cross S.J., Ex. A-2.)

On September 13, 2001, Michael Budd, Chief Executive Officer of Digital Media at the time, fired the Plaintiff from his employment position with Digital Media.  (Traicoff Dep. 13:14-23.)  In February 2002, Michael Budd resigned from his position with Digital Media and Delbert Craig Hane became the President of the company.  On March 8, 2002, the Plaintiff entered into a written contract with Digital Media in which the Plaintiff agreed to grant Digital Media the right to use the Plaintiff's audio recordings in exchange for 50,000 shares of stock in Digital Media "[i]n lieu of fifty thousand dollars ($50,000.00)."  (Compl. Ex. 2.)  The contract further stated that "this contract is not assignable by [Digital Media] and shall be binding upon the heirs, legal representatives, successor and assigns of the parties hereto."  (*Id.*)

_____

[2]  The Plaintiff's edits provided no substantive changes to the scripts, but were for the purpose of making the language less technical and easier for a layperson to understand. (Traicoff Dep. 25:2-14.)  Most often, he made these changes during the actual recording sessions while the narrator read through the script.  (*Id.* 25:15-20.)

At some point previous to this time, around September 2001, Hane created a second entity, Staffing Tools, to continue selling the software at issue. In September 2001, Digital Media and Staffing Tools entered into a licensing agreement in which Digital Media granted Staffing Tools a non-exclusive license to sell its software training programs in exchange for five percent (5%) royalties on those sales. Around the same time, Digital Media lacked the financial resources to continue its operations and it ceased doing business. Digital Media had accrued tremendous debt to multiple creditors, including unpaid payroll taxes owed to the Internal Revenue Service. Its only income was the royalty stream it received from the licensing agreement with Staffing Tools and from a previously signed licensing agreement with a European company, Euro-Sync. Due to Digital Media's large amount of debt and little income, the Plaintiff's stock in Digital Media was worthless. However, Staffing Tools continued to sell the software at issue containing the audio recordings produced by the Plaintiff.

## II.    STANDARD OF REVIEW

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light most reasonably favorable to the

nonmoving party.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999).  On cross-motions for summary judgment, the court views the evidence in the light most favorable to and draws all reasonable inferences in favor of the party against whom the motion under consideration is made.  *Tegtmeier v. Midwest Oper. Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

## III.     DISCUSSION

The Plaintiff filed this suit against Digital Media, Staffing Tools, and Hane, among other defendants, claiming copyright infringement, breach of contract, and fraud.  Digital Media filed a counter-claim against the Plaintiff alleging fraud, tortious interference with business relationships, and indemnity.  Staffing Tools filed a counter-claim against the Plaintiff alleging tortious interference with business relations.

### A.     The March 2002 Contract and the Copyright Act of 1976 Allow Digital Media's Sublicensing of its Exclusive Rights

At the center of this case is the March 8, 2002 contract between the Plaintiff and Digital Media.  The contract establishes a licensing agreement in which the Plaintiff granted Digital Media "the exclusive right, privilege and license" to use the audio recordings "and to make and/or use arrangements thereof, in the manufacture and sale of parts of voices serving to reproduce the Audio in the United States."  (Compl. Ex. 2.) In essence, the contract allows Digital Media to sell its computer training programs, which incorporated the Plaintiff's audio recordings, without violating the Plaintiff's

copyright rights, if any, in the audio recordings.  The contract also contains an anti-assignment provision, specifically stating that "[t]his contract is not assignable by [Digital Media] and shall be binding upon the heirs, legal representatives, successors and assigns of the parties hereto."  (*Id.*)

In a separate document, Digital Media granted Staffing Tools a non-exclusive license to sell Digital Media's computer training programs.  In return, Staffing Tools agreed to pay Digital Media royalties in the amount of five percent (5%) on each sale of the training programs.  Subsequently, Staffing Tools allegedly sold numerous copies of the training programs, including programs containing audio material extracted from the Plaintiff's audio recordings.

Accordingly, the Plaintiff claims that Digital Media breached the March 2002 contract, specifically the anti-assignment provision of the contract, by issuing the nonexclusive license to Staffing Tools, and that Staffing Tools infringed on the Plaintiff's copyright interest in the audio recordings by selling the training programs without an appropriate license in the audio recordings.  In response, the Defendants argue, among other things, that Digital Media did not breach the contract because the anti-assignment clause does not prohibit the assignment of rights under the contract, including the right to use the audio recordings.  Likewise, because the anti-assignment clause does not prohibit the assignment of rights under the contract, the Defendants aver that Staffing Tools did not infringe on the Plaintiff's copyright interests in the audio recordings because it properly obtained Digital Media's right to use the audio recordings.  The court therefore must determine whether the sublicensing agreement between Digital Media

-6-

and Staffing Tools effectively passed along the right to use the audio recordings to Staffing Tools—in other words, that the sublicensing agreement is within the scope of the Copyright Act of 1976, 17 U.S.C. § 101 et seq. (the "1976 Act" or "Act") and that it does not violate the anti-assignment clause of the March 2002 contract.

### 1.    *The Plaintiff Conveyed Exclusive Rights to Digital Media*

The 1976 Act grants an owner of a copyright in a sound recording exclusive rights to do and authorize any of the following: (1) reproduce the copyrighted work; (2) prepare derivative works based upon the copyrighted work; (3) distribute copies of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; and (4) perform the copyrighted work publicly by means of a digital audio transmission.  17 U.S.C. § 106.  The copyright owner may transfer[3] any of these exclusive ownership rights by written instrument.  *Id.* § 204.  When the owner makes such a conveyance, the grantee obtains an exclusive license in the copyrighted material.  *Kennedy v. Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999) (citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774-75 (7th Cir. 1996)).  The grantee, or licensee, violates the copyright by exceeding the scope of this license.  *Id.*

Neither party contests that the March 2002 contract conveyed to Digital Media the exclusive right to use the audio recordings in the manufacture and sale of its computer training programs, and that such right extended through the duration of the

---

[3] "A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license."  17 U.S.C. § 101.

copyright, including "all renewals and extensions thereof." (Compl. Ex. 2.) These limitations define the scope of the license in terms of both purpose (to use the recordings in the manufacture and sale of the computer programs) and duration (through the life of the copyright). Essentially, the Plaintiff argues that Digital Media impermissibly exceeded the scope of the license by sublicensing its rights to Staffing Tools. The court disagrees because, as will be explained below, Digital Media's sublicensing of its exclusive rights is not prohibited by the 1976 Act nor is it outside the scope of the contract.

2.    *The 1976 Act does not Prohibit the Sublicensing of Exclusive Rights*

Next, the court must determine whether the 1976 Act allows an exclusive licensee to transfer a license (or a portion of the rights therein) to a third party without the consent of the original author of the copyright. While both parties are silent on this issue, the court recognizes that this is a novel issue within the Seventh Circuit, and that the courts outside the circuit that have addressed this issue disagree on the result.

Notably, the Ninth Circuit ruled in *Gardner v. Nike, Inc.*, 279 F.3d 774, 778-81 (9th Cir. 2002) that, under the 1976 Act, exclusive licenses are only assignable with the consent of the licensor. In *Gardner*, Nike granted Sony an exclusive license to use a cartoon character created by Nike. Subsequently, without Nike's consent, Sony transferred its exclusive rights under the license to Gardner. Nike disapproved of the sublicense to Gardner and a lawsuit commenced. Gardner argued that the sublicense

was proper because Sony's exclusive license made it an "owner" under the Act.  As an "owner," the original licensee was free to transfer its exclusive rights under § 201 of the Act.  Relying on its interpretation of the statutory language of the §§ 101 and 201(d) of the Act, the Ninth Circuit ruled that § 201(d)(2) limits the rights of an exclusive licensee to those "protections and remedies" afforded in the 1976 Act, which do not include the right to transfer its rights under an exclusive license without the consent of the original licensor.  *Gardner*, 279 F.3d 780.

The decision in *Gardner* has received criticism from at least one other court, *see In re Golden Books Family Entm't, Inc.*, 269 B.R. 311 (Bankr. D. Del. 2001) (McKelvie, D.J., sitting in a bankruptcy proceeding) (criticizing the district court decision affirmed in *Gardner*, and holding that exclusive licensees are free to transfer their licenses without the consent of the original copyright owner); *see also In re Valley Media, Inc.*, 279 B.R. 105, 135 (Bankr. D. Del. 2002) ("Exclusive licenses grant the licensee a property right in the copyright that is freely transferrable . . . ."); *In re Patient Educ. Media, Inc.*, 210 B.R. 237, 240 (Bankr. S.D.N.Y. 1997) (dictum) ("The holder of the exclusive license is entitled to all of the rights and protections of the copyright owner to the extent of the license.  Accordingly, the licensee under an exclusive license may freely transfer his rights . . . ."  (citations omitted)), and from several secondary sources, including a preeminent treatise on copyright law, *see* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.02[B][4]; Kate Williams, Note, *Gardner v. Nike*, 18 Berkeley Tech. L.J. 371, 372 (2003) ("The [*Gardner*] decision misreads the statute, it ignores prior decisions, and it improperly analogizes to patent law."); Peter H. Kang & Jia Ann

Yang, Case Note, *Doctrine of Indivisibility Revived?*, 18 Santa Clara Computer & High Tech. L.J. 365, 371-373 (2002) (criticizing the court's statutory interpretation of § 201(d)(4)); Aaron Xavier Fellmeth, *Control without Interest: State Law of Assignment, Federal Preemption, and the Intellectual Property License*, 6 Va. J.L. & Tech. 8, 20-27 (2001) (criticizing the district court decision affirmed in *Gardner*).

This court also finds the reasoning in *Gardner* to be unpersuasive. A natural reading of the Act's language leads to the conclusion that exclusive licensees, as copyright owners of their exclusive rights, are free under the Act to transfer those rights to third parties. First, a "'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance . . . of a copyright or of any of the exclusive rights comprised in a copyright, . . . but not including a nonexclusive license." 17 U.S.C. § 101. In addition, the Act explains that the "'Copyright owner', with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right." *Id.* From these definitions, it follows that a conveyance of an exclusive license of any of the exclusive rights comprised in a copyright constitutes a transfer of copyright ownership in those exclusive rights, and the exclusive licensee becomes the copyright owner of those exclusive rights.

Section 201(d)(1) of the Act[4] allows the ownership of a copyright to be transferred in whole or in part by any means of conveyance. In essence, § 201(d)(1) enables an owner to transfer any fraction of his or her bundled rights to another party, thereby making that party the owner of those particular rights, or, as defined by § 101, the "copyright owner" of the transferred rights. Pursuant to § 201(d)(2),[5] the owner of the transferred exclusive rights is entitled to all of the "protection and remedies" afforded to the copyright owner by this title.

The *Gardner* court ruled that § 201(d)(1) does not apply to transfers by exclusive licensees or owners of a particular exclusive right because the section addresses "the apportionability of the copyright owner's interest in the totality of the copyright." *Gardner*, 279 F.3d at 779. It ruled that § 201(d)(2) applies instead, and that it "only conferred the 'protections and remedies' explicitly included in the 1976 Act, but not the rights." *Id.* Thus, according to *Gardner*, the right to transfer ownership of a copyright does not fall within the "protections and remedies" included in the 1976 Act.

---

[4] Section 201(d)(1) provides:

(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

[5] Section 201(d)(2) provides:

Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protections and remedies accorded to the copyright owner by this title.

The court disagrees with Gardner's interpretation of § 201(d).  First, § 201(d)(2) explicitly allows for the transferability of exclusive rights: "Any of the exclusive rights comprised in a copyright . . . may be transferred as provided [§ 201(d)(1)] and owned separately."  The next sentence in § 201(d)(2), which allows an owner of an exclusive right "all of the protection and remedies" accorded by the Act, should not be interpreted as limiting the owner's right to transfer the exclusive right.  According to *Gardner*, the Act's inclusion of the phrase "protections and remedies" somehow excludes the owner's right, which is set forth in the Act's preceding sentence, to transfer an exclusive right because the right to transfer is a "right," not a "protection."  Yet, *Gardner* admits that the phrase "protections and remedies" encompasses at least one "right" under the Act: the owner's right to institute an action for infringement in its own name pursuant to § 501(b).  *Gardner*, 279 F.3d at 780 n.4.  Under this interpretation, the phrase "protections and remedies" encompasses some rights under the Act (at least one), but excludes others.

The court must disagree.  The very act of Congress establishing a right under the statute grants protection to that established right.  Indeed, the first sentence of        § 201(d) clearly expresses the right for an owner of an exclusive right to transfer that right, in whole or in part.  By expressly including that right in the 1976 Act, Congress provided protection of that right.  The Act does not prevent an exclusive licensee (who is clearly the "owner" of the right under § 101) of a right to transfer that exclusive right, in whole or in part, to another party.  Indeed, if anything, the language of § 201(d) promotes the divisibility and transferability of exclusive rights.

In this case, the March 2002 contract indicates the Plaintiff's conveyance to Digital Media of the exclusive right to use the audio recordings in the manufacture and sale of the computer training programs.  The conveyance grants Digital Media ownership status in such exclusive right.  The 1976 Act does not prevent Digital Media from transferring the exclusive right, in whole or in part, to Staffing Tools.  However, the court must still determine whether the March 2002 contract prevents the sublicensing.

### 3.    *The Anti-Assignment Clause Does Not Prohibit the Assignment of Rights Under the Contract*

At the center of the Plaintiff's arguments is the effect of the anti-assignment clause, included in the March 2002 contract, which states: "This contract is not assignable by [Digital Media] and shall be binding upon the heirs, legal representatives, successors and assigns of the parties hereto."  (Compl. Ex. 2.)  The Plaintiff argues that the anti-assignment clause absolutely prevents Digital Media from sublicensing its rights under the contract to Staffing Tools.  Thus, by sublicensing its rights, Digital Media breached its contract with the Plaintiff, and, in turn, Staffing Tools lacked legitimate rights to use the Plaintiff's audio recordings and infringed on the Plaintiff's copyright.

"Normal rules of contract construction are generally applied in construing copyright agreements."  *Kennedy v. Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999) (citing 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.08).  Indiana common law recognizes the assignment of contractual rights.  *Chrysler Fin. Co., LLC v. Ind. Dep't of State Revenue*, 761 N.E.2d 909, 912 (Ind. Tax 2002).  However,

-13-

parties may include an anti-assignment provision in the contract, prohibiting  (1) the assignment of rights, (2) the assignment of duties, or (3) both.  But, careful detail must be given to the language of such provision.

In the March 2002 contract, the anti-assignment provision merely prohibits the assignment of "the *contract*," but failed to detail whether the prohibition applies to the assignment of rights, duties, or both.  The court has been unable to locate Indiana case authority discussing the use of the term "contract" in an anti-assignment provision. Alternatively, several treatises, including the Restatement (Second) of Contracts, provide sufficient and consistent guidance on the use of the term "contract" in the anti-assignment provision.  The Restatement (Second) states that "[u]nless the circumstances indicate the contrary, a contract term prohibiting assignment of "the contract" bars only the delegation to an assignee of the performance by the assignor of a duty or condition."  Restatement (Second) of Contracts § 322(1).  This rule is followed by Indiana's version of the Uniform Commercial Code, Ind. Code § 26-1-2-210(4) ("Unless the circumstances indicate the contrary, a prohibition of assignment of "the contract" is to be construed as barring only the delegation to the assignee of the assignor's performance."); *see also* U.C.C. § 2-210(4) (same), and by the premier treatises on contract law, *see, e.g.*, 9 Arthur Linton Corbin, *Corbin on Contracts* § 873 (Supp. 2006) ("General words against assigning the 'contract' should not readily be interpreted to mean that rights created by the contract shall not be assignable."); 29 Richard A. Lord, *Williston on Contracts* § 74:39 (4th ed.) ("Although the prohibition of assignment may be so clearly stated to be applicable to the right as well as the duty as

-14-

to preclude another interpretation, it will generally be found to relate only to the delegation of performance by the builder."); E. Allan Farnsworth, *Contracts* § 11.4 (3rd ed. 1999) ("[A] prohibition of an assignment of 'the contract' is to be interpreted as barring only the delegation of duties, not the assignment of rights."). Case law outside of Indiana tends to follow this rule. *See, e.g.*, *Cedar Point Apartments, Ltd. v. Cedar Point Inv. Corp.*, 693 F.2d 748, 753 (8th Cir. 1982) ("[U]nless intent to the contrary is shown, a contractual prohibition against 'assignment of the contract' is presumed as a matter of law to refer only to delegation of contractual duties, not assignment of rights."); *In re Jackson*, 311 B.R. 195, 201 (Bankr. W.D. Mich. 2004) (applying Restatement (Second) of Contracts § 322(1)).

The March 2002 contract fails to clearly state that the anti-assignment provision was intended to prohibit Digital Media's assignment of rights under the contract. The court therefore will apply the generally accepted rule stated above, interpreting the prohibition against the assignment of "the contract" to refer only to the delegation of contractual duties, not assignment of rights. Digital Media's sublicensing agreement with Staffing Tools assigns the latter certain nonexclusive rights, rights that Digital Media gained from the March 2002 contract. The contract's anti-assignment provision fails to preclude the assignment of rights. Consequently, the contract does not prevent Digital Media from assigning a portion of its rights to Staffing Tools in the subsequent sublicensing agreement.

Because the contract does not prevent the assignment of rights to Staffing Tools, Digital Media did not breach its contract. Likewise, the assignment of nonexclusive

-15-

rights to Staffing Tools granted it the right to use the Plaintiff's audio recordings in the sale of the computer training programs.  Therefore, Staffing Tools did not infringe on the Plaintiff's copyright.  For these reasons, the court will **GRANT** summary judgment in favor of Digital Media on the Plaintiff's breach of contract claim, and in favor of Staffing Tools on his copyright infringement claim.

> **B.     The Court Doubts Whether the Plaintiff's Audio Recordings were Copyrightable Under the 1976 Act**

On April 10, 2003, prior to commencing this action, the Plaintiff filed a certificate of registration with the United States Copyright Office claiming a copyright in the various "sound recordings" that he produced in his recording studio while working as a subcontractor for Digital Media.  (Compl. Ex. 4.)  He argues that Staffing Tools infringed on his copyright in the "sound recordings."  "To establish copyright infringement, a plaintiff must prove '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

The court's analysis above assumes that the Plaintiff's audio recordings were copyrightable as sound recordings in the first place.  Yet, whether the audio recordings were indeed copyrightable is a legal issue that the parties heavily disputed throughout their summary judgment briefs.  It is not necessary for the court to decide this issue because, as explained above, to the extent the Plaintiff had a copyright interest in the

audio recordings, the rights to use and sell the recordings were appropriately passed on to Staffing Tools. Nevertheless, the court will briefly explain its doubts as to whether the audio recordings qualify as "sound recordings" under the 1976 Act.

### 1.    The Digital Media Software Programs Contain Audiovisual Works

Digital Media produced instructional computer software programs, which trained users on how to use various other kinds of computer programs.[6] Each program contained both audio and visual components. The person using the instructional software would be instructed and prompted by a voice in addition to written training information contained in the software and visual instructions on the computer screen. The first step to produce the voice component for the training software was to produce a written script. Digital Media's employees, or, at times, contracted third parties, produced the actual written script. Next, the written script had to be transformed into an audio format so that it could be incorporated in the software. Digital Media hired the Plaintiff to transform the written scripts into audio format. Typically, the Plaintiff received a written script from Digital Media, hired a narrator to read the script in his recording studio, edited the script during the recording process,[7] created a digital recording of the script, and turned the audio recording over to Digital Media. Then, Digital Media imported the audio recording into a sound editing program to remove mistakes,

---

[6] For example, Digital Media's software programs provided instruction on how to use computer programs such as Photo Shop, Acrobat PDF, Acrobat Illustrator, Quark, and others. (Compl. Ex. 3.)

[7] See footnote 2.

miscues, heavy breaths, long pauses, and "talkback" between the voice talent and the recording booth. Thus, Digital Media, not the Plaintiff, performed the final editing of the audio clips. Finally, Digital Media incorporated the edited audio clips into the final product.

The final product is a computer software program that, when activated, will produce an audiovisual work on the computer screen. A "computer program" is "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. In other words, the computer program is the actual written code that drives the program's expression. Courts treat computer programs as "literary works," *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995) (citation omitted); *qad. inc. v. ALN Assocs., Inc.*, 974 F.2d 834, 835 (7th Cir. 1992), which are "works, other than audiovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied." 17 U.S.C. § 101. Nevertheless, the audiovisual product that is embodied in the computer program is copyrightable as an audiovisual work.[8] *Midway Mfg. Co. v. Arctic Intern., Inc.*, 704 F.2d 1009, 1012 (7th Cir. 1983) (citing *Williams Elecs., Inc. v. Arctic Int'l, Inc.*, 685 F.2d 870, 872-73 (3rd Cir. 1982); *Stern Elecs., Inc. v. Kaufman*, 669 F.2d 852 (2d Cir. 1982)); *see* 1-2 *Nimmer on*

---

[8] "'Audiovisual works' are works that consist of a series of related images which are intrinsically intended to be shown by the use of machines, or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied." 17 U.S.C. § 101.

*Copyright* § 2.09[D][1] ("A computer program may equally embody an audiovisual work. . . . [T]he program may be the vehicle in which an audiovisual work is fixed. . . . [I]t is clear that such a registrant has standing to allege audiovisual infringement.").

In essence, a computer program may contain more than one copyrightable work. First, the program code is a copyrightable subject matter that falls under the category of literary works. Second, the product of the program code, i.e., the screen displays and accompanying sounds, is a copyrightable subject matter that falls under the category of audiovisual works. Thus, the audiovisual works produced by Digital Media's software programs fall under the Act's definition of "audiovisual works."

2.    *The Plaintiff's Audio Recordings Fail to Qualify as "Sound Recordings" Under the Act*

The Plaintiff claims a copyright in the various "sound recordings" that he produced in his recording studio while working as a subcontractor for Digital Media.[9] The Act defines "sound recordings" as "works that result from the fixation of a series of musical, spoken, or other sounds, *but not including the sounds accompanying a motion picture or other audiovisual work*, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." 17 U.S.C. § 101 (emphasis added). Under this definition, it appears that a fixation of sounds that would

---

[9] The Plaintiff is not claiming a copyright interest in the underlying script, but only the audio recording produced in his recording studio. Under the Act, sound recordings do not include the underlying written work, i.e. the script.

qualify in all other respects as a sound recording will avoid that characterization if the sounds are created to accompany an audiovisual work.

The parties fail to direct the court to, and the court has been unsuccessful in finding any caselaw interpreting this particular exclusion found in the Act's definition of sound recordings.[10]   However, when interpreting the Copyright Act, the Supreme Court admonishes that "[s]trict adherence to the language and structure of the Act is particularly appropriate where, as here, a statute is the result of a series of carefully crafted compromises."  *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 748 n.14 (1989).  Moreover, in interpreting a statute, the court must first begin with the text. *Bowlds v. Gen. Motors Mfg. Div. of Gen. Motors Corp*., 411 F.3d 808, 811 (7th Cir. 2005) (citations omitted).  "The plain meaning of the legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a

_____

[10]  Although they amount to no more than persuasive authority, some journal articles discuss the definition's exclusion, often in the context of motion picture soundtracks.  *See* Vlad Kushnir, *Legal and Practical Aspects of Music Licensing for Motion Pictures*, 8 Vand. J. Ent. & Tech. L. 71, 72 (2005) (suggesting that most motion pictures contain both original music composed specifically for a particular film and preexisting music, and that while the movie studio must obtain an appropriate music license to incorporate preexisting music into the motion picture, it need not do so for music composed specifically for the movie because the Act excludes such music from the definition of sound recordings); John P. Strohm, Comment, *Writings in the Margin (of Error): The Authorship Status of Sound Recordings Under United States Copyright Law*, 34 Cumb. L. Rev. 127, 148 (2003-04) (same); *see also* Mary LaFrance, *Authorship and Termination Rights in Sound Recordings*, 75 S. Cal. L. Rev. 375, 397-400 (2002) (The author explains the possibility that a record company could circumvent the termination rights associated with sound recordings by initially releasing the musical recording in an enhanced CD.  An enhanced CD would qualify as an audiovisual work because it incorporates a visual display that can be viewed on a computer screen when the CD is placed in the computer's CD-ROM drive.  By releasing the music in an enhanced CD, the music would not qualify as a sound recording under the Act, because the Act's definition excludes sounds accompanying audiovisual works.  "The only crucial step will be to ensure that the musical recording is created as a part of the audiovisual work; if the musical recording is created separately, and then incorporated into an audiovisual work, the 'sound recording' characterization will still apply to the musical recording.").

result demonstrably at odds with the intentions of its drafters."  *Id.* (quoting *U.S. v. Ron Pair Enters.*, 489 U.S. 235, 242 (1982)).  Here, the statute expressly excludes "sounds accompanying a motion picture or other audiovisual work" from the definition of "sound recordings."  17 U.S.C. § 101.  Accordingly, the spoken recordings that accompany the audiovisual work are not sound recordings as defined under the Act.

The Plaintiff argues that this exclusion does not apply to this case because his audio recordings were "independently created . . . before [the Plaintiff] authorized Digital Media, Inc. to incorporate them into an 'audio visual work', namely the computer programs."  (Pl.'s Br. Supp. Cross S.J. 3.)  "That would be like Digital Media, Inc. claiming they could integrate music by the Beach Boys into their software and thereby invalidate the copyright and registration in those sound recordings by incorporating them into an audio visual work."  (*Id.*)  The Plaintiff is correct in stating that Digital Media cannot invalidate the copyright of an independent and preexisting sound recording, such as a Beach Boys song, simply by incorporating that sound recording into an audiovisual work.  In such a case, the audio recording already has an existing copyright and is completely independent of the audiovisual work.  However, such is not the case here.  The record undisputedly establishes that the Plaintiff's audio recordings were created for the sole purpose of being incorporated into Digital Media's audiovisual work.  Digital Media created the scripts that it needed to be transformed into audio form and handed those scripts over to the Plaintiff to complete that transformation.  The Plaintiff did so and handed the audio recordings back to Digital Media knowing that the only purpose of those recordings was for use in the training software.  Outside of Digital Media's

audiovisual tutorials, the audio recordings had no other life or purpose.  Indeed, the audio recordings were made for the sole purpose of accompanying the final audiovisual work.  Accordingly, the court believes that the Plaintiff's audio recordings cannot qualify as sound recordings, as defined by 17 U.S.C. § 101, because they "accompany" the software programs' audiovisual works.

Finally, the Plaintiff argues that regardless of how the Act defines sound recordings, the Act nonetheless allows parties to adjust copyright rights by contract, and that the parties did so by entering into the March 2002 contract specifically enumerating their respective rights.  Parties may adjust copyright rights by contract, *Liu v. Price Waterhouse LLP*, 302 F.3d 749, 755 (7th Cir. 2002), but they cannot create copyright rights where none exist.  The parties entered into the contract on March 8, 2002, well after the creation of the audio recordings and after the Plaintiff's firing.  The Plaintiff agreed to grant Digital Media "the right to record, reproduce, market and sell the audio" in exchange for 50,000 shares of Digital Media stock.  (Compl. Ex. 2.)  If, however, the Plaintiff did not have a copyright interest in the audio recording at the time of the contract, he could not create such an interest simply by asserting the interest in a contract.  The interest had to exist beforehand, and, for the reasons discussed above, the court doubts whether the Plaintiff ever had a copyright interest in the audio recordings.  The contract, therefore, would not establish a copyright interest in favor of the Plaintiff.

Without an underlying valid copyright interest, the Plaintiff's copyright infringement claim would fail.  Again, the court ultimately need not decide this issue, but

it expresses its doubt as to whether the Plaintiff had a valid copyright interest in the first place.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' Motions for Summary Judgment (Docket Nos. 207, 208, 209) are **GRANTED** as to the Plaintiff's breach of contract and copyright infringement claims.  The Plaintiff's Cross-Motion for Summary Judgment (Docket No. 221) is **DENIED**.[11]

The remaining claims—the Plaintiff's fraud claim against Mr. Hane and Digital Media's and Staffing Tool's cross-claims for fraud, tortious interference with business relationships, and indemnity—are state law claims.  28 U.S.C. § 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction."  The Seventh Circuit has said that "[t]he general rule is that when as here the federal claim drops out before trial . . . the federal district court should relinquish jurisdiction over the supplemental claim."  *Van Harken v. City of Chi.*, 103 F.3d 1346, 1354 (7th Cir. 1997); *see also Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003) (holding that after the dismissal of

---

[11]  The Complaint alleges copyright infringement against Graphic Computer Solutions Online University, Colorblind, Vantage Partners, LLC, Imaging Technologies, Inc., and Imaging Technologies Corporation.  These defendants have never been dismissed from this case.  However, the court's reasoning for dismissing the copyright infringement claim against Staffing Tools would apply also to these defendants.  As to Vantage Partners, LLC, there is no indication that the Plaintiff served this party, and therefore the claim against Vantage Partners, LLC is subject to dismissal pursuant to Federal Rule of Civil Procedure 4(m).  Accordingly, the claims against these defendants will be **DISMISSED**.

the federal claim, "the sole basis for invoking federal jurisdiction is nonexistent and the federal courts should not exercise supplemental jurisdiction over [the] remaining state law claims"). Given that summary judgment is appropriate on the federal claim (and the breach of contract claim), the court, in its discretion, **DECLINES** to exercise supplemental jurisdiction over the remaining state claim and cross-claims, which will be **DISMISSED WITHOUT PREJUDICE** to refiling in state court within thirty (30) days of this date. Judgment will be entered accordingly.

ALL OF WHICH IS ENTERED this 7th day of July 2006.

John Daniel Tinder, Judge
United States District Court

Copies to:

Robert F. Hunt
Hunt Hassler & Lorenz LLP
hunt@huntlawfirm.net

Philip Alan Sallee
universallee@insightbb.com

John F. Townsend III
Townsend & Montross
townsendmontross@aol.com